SOUTHERN PACIFIC COMPANY *v.* HAGLUND, ADMINISTRATRIX, ET AL.

SAME *v.* MOORE SHIPBUILDING COMPANY ET AL.

Nos. 472, 473. Submitted April 13, 1928.—Decided May 21, 1928.

Mr. *Wm. Denman* submitted for petitioner.

The whistle acceptance of a tendered passing signal is a positive assertion that no danger exists which is known to the accepting vessel and concealed from the vessel signalling for the maneuver. If there is such a danger, the vessel knowing it owes a positive duty to the asking vessel to blow the danger signal. A vessel knowing of such concealed danger and accepting a passing signal and failing to blow the danger signal, is in fault and is responsible for a collision "caused" by the hidden danger.

The tendering vessel may rely on the assurances of the accepting vessel and is not at fault for damages arising from proceeding as if the hidden danger were not there.

The contrary rule, laid down by the Ninth Circuit in this case, is opposed to the rule as recognized in the Second, Fourth, Sixth, and Eighth Circuits and all other cases. It is not the law and is a menace to life and property at sea. *The American*, 92 U. S. 432; *The Genevieve*, 95 Fed. 859; *The F. W. Wheeler*, 78 Fed. 824; *The Edna V. Crew*, 202 Fed. 1021; *The Lowell M. Palmer*, 142 Fed. 937; *Atlas Trans. Co. v. Lee Line*, 235 Fed. 492, on rehearing, 238 Fed. 349; *The Richmond*, 275 Fed. 970; *The Alabama*, 114 Fed. 214; *Santa Maria*, 227 Fed. 149; *Werdenfels*, 150 Fed. 400; *The Luther C. Ward*, 149 Fed. 787.

306

The *Relief*, and tow, should be held in sole fault, for had the circumstances been as safe as they properly seemed to the *Thoroughfare*, and as the *Relief's* acceptance told her they were, there was nothing which could possibly have caused a collision. The *Thoroughfare* would have passed safely on through the deep, straight and unobstructed channel, without hurt to anyone.

The *Thoroughfare* was *in extremis* when at the stern of the *Enterprise*. Her sudden turn to avoid her danger was her only salvation, the only thing she could do. The turn was, therefore, the proximate result of the antecedent invitation by the *Relief* to enter the trap, from which the *Thoroughfare* struggled to escape.

The burden of proof is on each vessel to establish fault on the part of the other. *The Victory,* 168 U. S. 410.

Where fault on the part of one vessel is established by uncontradicted testimony, and such fault is, of itself, sufficient to account for the disaster, it is not enough for such vessel to raise a doubt with regard to the management of the other vessel. *The City of New York,* 147 U. S. 72.

It is elemental that there should be a lookout on a tow which obscures the vision of a tug from approaching vessels. *Nevada* v. *Quick,* 106 U. S. 154; *Edward G. Murray,* 234 Fed. 61; *James A. Lawrence,* 117 Fed. 228; *Gladiator,* 132 Fed. 876; *Arthur M. Palmer,* 115 Fed. 420.

Every doubt as to the performance of the duty, and the effect of non-performance, should be resolved against the vessel sought to be inculpated until she vindicates herself by testimony conclusive to the contrary. *The Ariadne,* 13 Wall. 475; *The Anna,* 201 Fed. 58.

The mere finding that the *Thoroughfare's* act is the proximate cause does not make it the sole cause and does not absolve the court from considering whether the absence of a lookout was not a contributing cause. *The International,* 143 Fed. 468.

*Mr. Ira S. Lillick,* with whom *Mr. Hunt C. Hill* was on the briefs, submitted for the respondents, Moore Shipbuilding Company and Hildur Haglund, Administratrix.

*Mr. J. F. Sullivan,* with whom *Messrs. Edward I. Barry* and *Theodore J. Roche* were on the brief, submitted for the respondent, Rolph Navigation & Coal Company.

Mr. Justice Sanford delivered the opinion of the Court.

These two suits in admiralty, which were brought in the federal court for northern California, arose out of a collision between the ferryboat *Thoroughfare* and the steamship *Enterprise* in charge of the tug *Relief,* in the channel of San Antonio Creek, known as the Oakland Estuary, which resulted in damages to the *Thoroughfare* and the *Enterprise,* and the killing of Ernest Haglund, a workman on the *Enterprise.* In No. 472 the administratrix of Haglund's estate libelled the Southern Pacific Co., the owner of the *Thoroughfare,* and the Rolph Navigation & Coal Co., the owner of the *Relief,* for the damages arising from his death. In No. 473 the Moore Shipbuilding Co. libelled the *Thoroughfare* for the damages to the *Enterprise;* and the Southern Pacific Co., as claimant of the *Thoroughfare,* brought in as third party respondents the *Enterprise,* the *Relief* and the Rolph Navigation & Coal Co., to answer for the damages to the *Thoroughfare.*[1]

The suits were tried on the same evidence as to the responsibility for the collision, and were consolidated for hearing in the Circuit Court of Appeals. The District Court found that the collision was caused solely by the negligence of the *Thoroughfare,* without fault on the part of the *Relief* or the *Enterprise,* and entered decrees against

---

[1] Another tug, the *Hercules,* belonging to the Rolph Navigation & Coal Co., which was also impleaded, is not here involved.

the Southern Pacific Co. for the damages to the *Enterprise* and the death of Haglund. These decrees were affirmed by the Circuit Court of Appeals. 19 F. (2d) 878.

The channel of the Estuary, the great artery of commerce between San Francisco and Oakland, is 500 feet wide. The collision occurred about noon, on a clear day. The *Enterprise*, a steam freighter 320 feet long, which was undergoing repairs at the yard of the Moore Shipbuilding Co. on the north bank of the Estuary, was let down stern foremost on a marine railway into the waters of the Estuary, and lay at right angles across the channel. She was without power, had no lookout, and had been placed by the Shipbuilding Company in charge of the *Relief* to be berthed at a nearby wharf on the Company's plant.[2] The *Thoroughfare*, a steam ferryboat, was then approaching at her full speed of 13 miles an hour on an easterly course through the Estuary. When about 2,900 feet away she sounded a single blast of her whistle. This was not answered by the *Relief*, which was then engaged in stopping the sternway of the *Enterprise* towards the south side of the channel. When the *Thoroughfare* had approached within about 1,000 feet of the *Enterprise*, the *Relief* had arrested the movement of the *Enterprise* and was holding her dead in the water, with her stern about 100 feet from the south edge of the channel, leaving an ample opening for the passage of the *Thoroughfare*. At this distance the *Thoroughfare* again sounded a single blast of her whistle, indicating an intention to direct her course to starboard and pass in the rear of the *Enterprise*. This was accepted by the *Relief* by a like single blast. At this time the master of the *Relief* was aware of the presence at a considerable distance on the other side of

[2] The *Relief* was assisted by the tug *Hercules* referred to in note 1, supra.

the *Enterprise* of the tug *Union* [3] which, with a tow, was approaching on a westerly course near the south edge of the channel. The master of the *Thoroughfare,* whose view was then intercepted by the *Enterprise,* was not aware of the presence of the *Union.* After the *Relief* gave her answering signal the *Thoroughfare* continued to advance at full speed, for about 1,000 feet, heading for the 100 foot opening between the stern of the *Enterprise* and the edge of the channel, and not knowing what vessels might be encountered on the other side. Meanwhile the *Enterprise* remained at rest without any change in position. Just as the *Thoroughfare* was about to pass, she saw the *Union* approaching on the other side and blew two whistles to indicate her intention of passing on the starboard side of the *Union* after she got clear of the *Enterprise.* This was accepted by two blasts from the *Union.* But before clearing the *Enterprise* the *Thoroughfare* suddenly changed her course to port, and struck the *Enterprise.* There was no occasion for this change to port. The *Thoroughfare* was not then in peril; the *Union* was about 900 feet away and had already slowed down; and the *Thoroughfare* would have had ample time and space after clearing the *Enterprise* in which to go to port and pass on the starboard side of the *Union* in accordance with the previous exchange of signals. And the *Thoroughfare* could herself have stopped within 300 feet.

We agree with the view of both the lower courts that the collision was caused solely by the negligence of the *Thoroughfare,* which not only approached the passageway in the rear of the *Enterprise* at full speed, without knowing whether she would encounter any vessel on the other side, but needlessly commenced the execution of the passing movement with the *Union* before she had cleared the

---

[3] The *Union* is not brought into these suits.

*Enterprise;* and that there was no contributing fault on the part of the *Relief* or the *Enterprise.*

The *Relief* was not at fault in accepting the passing signal of the *Thoroughfare.* This was merely an assent to the proposed passage in the rear of the *Enterprise,* expressing an understanding of what the *Thoroughfare* proposed to do and an agreement not to endanger or thwart it by permitting an interfering change in the position of the *Enterprise.* See *Atlas Transp. Co.* v. *Lee Line Steamers* (C. C. A.), 235 Fed. 492, 495. And the *Relief,* being in a position to fully carry out its agreement, was under no obligation to decline the passing signal because of the approach of the *Union* on the other side and to sound instead a warning signal. There was nothing in the situation to indicate that the approach of the *Union* would prevent the *Thoroughfare* from passing safely, if, as the *Relief* had the right to assume, it were navigated with due care. See *Atlas Transp. Co.* v. *Lee Line Steamers* (C. C. A.), 238 Fed. 349, on petition for rehearing. The doctrine of *The F. W. Wheeler* (C. C. A.), 78 Fed. 824, that a moving tug is in fault in accepting, without warning, a passing signal when she knows that the passage is obstructed by her grounded tow whose movement she cannot control, has no application here.

Nor was the *Enterprise* at fault in not having a lookout. The rule stated in *The Ariadne,* 13 Wall. 475, 478, as to the responsibility of a moving vessel for the failure of her lookout to discover an approaching vessel in time to avoid a collision, does not apply to a vessel in the position of the *Enterprise,* which was at rest, without power; and the absence of a lookout upon her did not in any manner contribute to the collision.

*Decrees affirmed.*